NO. 07-08-0355-CV

IN THE COURT OF APPEALS

FOR THE SEVENTH DISTRICT OF TEXAS

AT AMARILLO

PANEL E

JUNE 23, 2009

_____

CAMBRIDGE PRODUCTION, INC., APPELLANT

v.

GEODYNE NOMINEE CORPORATION, WILLIAM L.
ARRINGTON AND AMARILLO NATIONAL BANK, AND
COLUMBUS T. HELTON, ET AL., APPELLEES

_____

FROM THE 31ST DISTRICT COURT OF HEMPHILL COUNTY;

NO. 5933; HON. STEVEN RAY EMMERT, PRESIDING

_____

Before HANCOCK and PIRTLE, JJ., and BOYD, S.J.[1]

**OPINION**

This appeal arises from a summary judgment rendered in a suit filed by appellant

Cambridge Production, Inc. (herein Cambridge) against appellees Geodyne Nominee

Corporation (herein Geodyne), Amarillo National Bank (herein ANB), and William L.

Arrington (herein Arrington).  The suit also named as defendants numerous mineral and/or

---

[1]John T. Boyd, Chief Justice (Ret.), Seventh Court of Appeals, sitting by
assignment.  Tex. Gov't Code Ann. §75.002(a)(1) (Vernon 2008).

royalty interest owners in Section 33, Block M-1, H&GN Ry. Survey, Hemphill County, Texas, fully enumerated in Cambridge's pleading in the underlying suit (herein Section 33 necessary defendants) and Verneal Prater and wife Juanita Prater (herein Section 39 necessary defendants). A recitation of the somewhat complicated procedural history is necessary to our discussion of the appeal.

In the suit, Cambridge sought the termination of forty-four (44) oil and gas leases (the Section 33 leases) and a related pooled unit (the Prater unit) as well as damages. Cambridge is the lessee under new oil and gas leases (the new Section 33 leases) covering the same leased premises as the Section 33 leases. The defendants were the owners of the Section 33 leases. The necessary defendants were the owners of the mineral interests in Section 33 and the lessors in both the Section 33 leases and the new Section 33 leases. The Section 39 necessary defendants were the owners of mineral interests under Section 39 with which the Section 33 leases had been pooled into the Prater Unit.

The Section 33 leases provided for a primary term of five years from their date and for as long thereafter as oil, gas or other hydrocarbons, or other minerals or lease substances were produced from the leased premises or from lands with which the leased premises were pooled or unitized. The five year primary term of the Section 33 leases expired on July 18, 1983, and there was no production of oil, gas, or other minerals during that term from Section 33.

In material part, the pooling provisions in all but one of the Section 33 leases provided:

7. Pooling. Lessee is hereby granted the right, at any time and from time to time, whether before or after production, to pool this lease for the production of oil, gas or condensate, or any or either of them. . . .

Such pooling shall be effected by the filing by Lessee of a written designation in the county or counties, in which the premises are located, identifying and describing the pooled unit. The production of oil, gas or condensate from any zone of the land so pooled and the development and operation on such land, including the commencement, drilling, completion and operation of a well thereon, or the existence thereon of a shut-in gas well, shall be considered and construed and shall have the same effect, except for the payment of royalty, as production, development and operation, or the existence of a shut-in gas well on the leased premises, regardless of the location of the well on the unit.

Thirty-nine (39) of these forty-four leases were subsequently amended to provide that Section 33 could be pooled with other lands to form a consolidated proration unit, provided that the lessee must pool at least two-thirds of the lands covered by said lease.

In pertinent part, the pooling provision in the remaining Section 33 leases provided:

7. Lessee is hereby granted the right to pool or unitize this lease, the land covered by it with any other land, lease, leases, mineral estates or parts thereof for the production of oil, liquid hydrocarbons and all gasses and their respective constituent products or any of them. . . . Lessee shall file written unit designations in the county in which the premises are located. Such units may be designated either before or after the completion of wells, and lessee may reduce, enlarge, modify or dissolve such units at any time prior to the discovery of oil or gas on the pooled acreage, or, after discovery of oil or gas at any time subsequent to the cessation of production thereof by filing a written declaration to such effect in the same county. Drilling operations and production on any part of the pooled acreage shall be treated as if such drilling operations were upon or such production was from the land described in this lease whether the well or wells be located on the land covered by this lease or not. The entire acreage pooled into a unit shall be treated for all purposes, except the payment of royalties on production from the pooled unit, as if it were included in this lease . . . .

On January 3, 1980, the Prater 1-39 well (herein Prater No. 1 well) was completed in the interval between 14,364 feet and 14,372 feet, and it has continued to produce solely from that interval since its completion. On May 9, 1980, Geodyne's predecessor-in-title, Northern Natural Gas Company, executed and filed in the Deed Records of Hemphill

3

County, the Designation of the Prater No. 1 Unit which pooled the Section 33 leases with the Section 39 leases.  In pertinent part, that unit designation provided:

> . . . Declarant hereby designates a unit to be known as the Prater No. 1 Unit (the "Unit") for the purposes of exploring, drilling, mining and operating for, producing and owning hydrocarbons produced from wells classified as "gas wells" by the Railroad Commission of Texas, INSOFAR AND ONLY INSOFAR as the Leases cover and apply to that certain 704 acres of land in Hemphill County, Texas, more particularly described on Exhibit "B" attached hereto and made a part hereof for all purposes and the stratigraphic equivalent between the depths of 14,634 feet and 14,929 feet below the surface encountered in the Prater No.1 Well located thereon (the "Unit Acreage").

The unit designation also included a provision allowing its amendment "at any time and from time to time in order to (1) correct any error herein, . . . ."

Geodyne's predecessors-in-title filed an Amended Designation of Prater Unit No. 1 (Unit Designation No. 2) which amended Unit Designation No. 1 to include a lease owned by Arrington and George W. Arrington.  Beyond adding the new lease, no substantive changes were made to Unit Designation No. 1 by the second unit designation. On February 3, 1982, appellees' predecessors-in-title filed an amended designation of Prater Unit No. 1 (Unit Designation No. 3) which amended the description of the Prater Unit to include additional lands in Section 33 but did not change the reference to the stratigraphic equivalent between the depths of 14,634 feet and 14,929 feet contained in Unit Designation No. 1.  Another unit designation (Unit Designation No. 4) dated May 10, 1990, was prepared by the then owners of the Section 33 leases which purported to amend the Prater Unit No. 1 to include the stratigraphic equivalent of the interval in which the producing perforations were located, i.e., 14,364 and 14,372 feet below the surface. However, this instrument was never filed in the Deed Records of Hemphill County.

4

It is undisputed that since January 1, 1980, no oil, gas, or other minerals have been produced from that part of Section 39 located in the areal extent of the Prater Unit, other than from the Prater 1-39 well, and that production has been from perforations located at a depth of 14,364 feet to 14,372 feet subsurface. It is also undisputed that since January 1, 1980, no delay rentals or shut-in royalty payments have been made in connection with appellees' oil and gas leases covering Sections 33 or 39, no oil, gas, or other minerals have been produced from Section 33, and no drilling or reworking operations have been conducted on Section 33.

It is also undisputed that since January 1, 1980, the Prater 1-39 well has continued to produce from the perforations located at a depth of 14,364 to 14,372 feet. The necessary defendants have been paid and accepted royalties from that production to which they would not otherwise be entitled inasmuch as the well is not located on Section 33.

On March 18, 1999, Geodyne and Arrington executed, and filed in the Deed Records of Hemphill County, an amended designation of Prater Unit No. 1 (Unit Designation No. 5) which recited that the description of the stratigraphic equivalent of depths between 14,634 and 14,929 encountered in the Prater No.1 Well was the result of a scrivener error and the designations "should have been limited to the correct stratigraphic equivalent of depths between 14,<u>36</u>4 and 14,929 below the surface encountered in the Prater No. 1 Well." On December 30, 2005, ANB (successor to George W. Arrington) executed and filed in the Deed Records of Hemphill County, an Amended Designation of Prater Unit No. 1, (Unit Designation No. 6) that ratified and confirmed Unit Designation No. 5.

5

In early 1999, Cambridge obtained from the mineral interest owners in Section 33, oil, gas, and mineral top leases (the new Section 33 leases). Each of these leases contained a provision that in the event there was a presently existing oil and gas lease on the premises, the lease covered the lessor's reversionary interest but was subject to "such prior lease, lease modification or unitization agreement, insofar as the same is valid . . . ." They also provided that Cambridge was given "the right to make written demand on behalf of Lessor . . . to release of record such existing oil and gas lease and to take such other and further action as may be necessary to obtain such release . . . ."

On cross-motions for summary judgment, the trial court granted appellees' motion for summary judgment and entered judgment declaring the Section 33 leases and the unit designations creating the Prater Unit were in full force and effect and that the new Section 33 leases were canceled.

In pursuing the appeal, Cambridge presents three issues for our decision. In the first issue, it contends:

> (a) In interpreting the Unit Designations, the trial court erred in ignoring the plain meaning of the clear and unambiguous language describing the Prater Unit by impermissibly using extrinsic evidence (not referred to in the Unit Designations) to (i) find an alleged obvious error in the description of the Prater Unit, as well as (ii) provide a basis for correcting the alleged error.

> (b) The trial court erred in holding the Unit Designations Nos. 5 and 6 were effective to amend the Unit Designations so as to include the stratigraphic equivalent of 14,634 feet and 14,929 feet below the surface encountered in the Prater No.1 Well.

> (c) The trial court erred in holding that since the Prater Unit created by the Unit Designations must be construed to include the producing interval in the Prater 1-39 Well, production from that well perpetuated both the Prater Unit and the Section 33 Leases, and Cambridge has no cause of action against the Defendants.

6

In its second issue, Cambridge contends:

(a) The summary judgment evidence conclusively established that the Section 33 Leases terminated prior to March 3, 1999.

(b) The summary judgment evidence conclusively established that any claim by the Defendants for *reformation* of the Unit Designations is barred by the four year statute of limitations contained in TEX. CIV. PRAC. & REM. CODE §16.051.

(c) The summary judgment evidence conclusively established that the Unit Designations were not ambiguous, but must be construed as describing the Prater Unit as the stratigraphic equivalent between the depths of 14,634 and 14,929 feet below the surface as encountered in the Prater No. 1 Well.

(d) The summary judgment evidence conclusively established that Unit Designations No. 5 and 6 were void and without effect as to Section 33.

(e) Geodyne and Arrington failed to meet their summary judgment burden of proof on their affirmative defense of *quasi estoppel*, so as to preclude Cambridge's Second Motion for Summary Judgment.

In its third issue, Cambridge contends: "Based on the summary judgment evidence, the Court should reverse the Final Judgment to the extent it grants Defendants' Motion for Summary Judgment and render judgment granting Cambridge's Second Motion for Summary Judgment on Grounds No. 1, 2, 5 and 6."

The first ground of Cambridge's Second Motion for Summary Judgment posited that Cambridge was entitled to judgment because it was undisputed that the primary term of the Section 33 leases expired prior to July 19, 1983, and, since January 1, 1980, no oil, gas, or other minerals had been produced from Section 33 or from lands pooled therewith and that no delay rentals or shut-in royalty payments were made in connection with Section 33 leases. Ground No. 2 argued that the last of the Initial Unit Designations was executed on February 2, 1982, and that by June 12, 1990, the owners of the Section 33 leases knew that the initial Unit Designations did not include the perforated interval in the

7

Prater No.1-39 Well, which was located in the interval of 14,364 feet to 14,372 subsurface, and any claims of the appellees were barred by the four year statute of limitations contained in Tex. Civ. Prac. & Rem. Code §16.051. Ground No. 6 argued that the uncontroverted summary judgment evidence established as a matter of law that at the time appellees executed and filed the Amended Unit Designations of record, the Section 33 leases had terminated.

In responding, appellees present four issues for our review. Those issues are:

**Issue One**: The Trial Court acted within its discretion in declaring that the Prater Gas Unit (including the original Unit Designation, the Initial Unit Designations, and all Amended Unit Designations) and Section 33 Leases are in Full Force and Effect.

A. The Trial Court correctly found an obvious error in the description of the Prater Unit and a basis for correcting the obvious error.

B. The Trial Court correctly held that Unit Designations 5 and 6 were effective to amend the Unit Designation to include the stratigraphic equivalent of 14,364 feet to 14,929 feet below the surface.

C. The Trial Court correctly held that production from the Prater 1-39 Well perpetuated the Prater Unit and the Section 33 Leases.

**Issue Two**: The Trial Court correctly declared that the New Section 33 Leases constitute clouds on Appellees' title and are void and of no force and effect.

A. Cambridge did not conclusively establish that the Section 33 Leases terminated prior to March 3, 1999.

B. The issue of the four-year statute of limitations barring reformation of the Unit Designations is irrelevant.

C. The Unit Designations were patently ambiguous.

D. Unit Designations 5 and 6 are valid and in full force as to Section 33.

**Issue Three**: The Trial court correctly denied Appellant's Motion for Partial Summary Judgment as to quasi estoppel.

8

(a) Geodyne and Arrington met their summary judgment burden of proof on their affirmative defense of Quasi Estoppel.

**Issue Four**: The Trial Court was correct in refusing to find that Appellant was a bona fide purchaser vis-a-vis the New Section 33 Leases.

The standards to be used in reviewing summary judgments are, by now, axiomatic. In reviewing cross-motions for summary judgment, the reviewing court considers whether a movant establishes that there is no genuine issue of material fact so that the movant is entitled to judgment as a matter of law. *Western Investment, Inc.* v. *Urena*, 162 S.W.3d 547, 550 (Tex. 2005). When parties file cross-motions for summary judgment and the court grants one motion and denies the other, the reviewing court should review both sides' summary judgment evidence and determine all questions presented. *FM Props. Operating Co. v. City of Austin*, 22 S.W.3d 868, 872 (Tex. 2000). If the trial court's order does not specify the grounds upon which it granted summary judgment, the appellate court must affirm the summary judgment if any of the summary judgment grounds are meritorious. *Id*.

Because it is dispositive of this appeal, we proceed directly to consider appellees' issue three in which they argue that they met their summary judgment burden of proof on their affirmative defense of quasi estoppel, and issue number four in which they contend the trial court was correct in refusing to find Cambridge was a bona fide purchaser vis-a-vis the new Section 33 leases.

Quasi estoppel is similar to but different from equitable estoppel. While equitable estoppel requires proof of a false statement or detrimental reliance, quasi estoppel requires no such showing. Rather, it precludes a party from accepting the benefits of a

9

transaction and then taking a subsequent inconsistent position to avoid corresponding obligations or effects. It applies when it would be unconscionable to allow a person or party to maintain a position inconsistent with one in which he acquiesced or from which he accepted a benefit. See *Stable Energy, L.P. v. Newberry*, 999 S.W.2d 538, 548 (Tex. App.–Austin 1999, pet. denied); *Atkinson Gas Co. v. Albrecht*, 878 S.W.2d 236, 240 (Tex. App.–Corpus Christi 1994, writ denied); *Steubner Realty 19, Ltd. v. Cravens Road 88, Ltd.,* 817 S.W.2d 160, 164 (Tex. App.–Houston [14th Dist.] 1991, no writ.)

Because Cambridge has no rights in Section 33 as a top lessee except such rights as it might have acquired under the new Section 33 leases, it cannot terminate the Prater Unit if the necessary defendants (the Section 33 mineral interest owners) have no such right. The summary judgment evidence is undisputed that the Section 33 mineral interest owners have accepted the benefit of revenues of production from the Prater No. 1 well. It is also undisputed that the Prater No. 1 well is not located on Section 33. Thus, the Section 33 mineral interest owners would not have received the royalties they have received over the years but for the Unit Designation of Prater No. 1. Cambridge's claim to title under the new Section 33 leases must rest upon repudiation by the top lessors of Geodyne's Section 33 leases. In doing so, they would, of necessity, be asserting a right inconsistent with the benefits that were previously accepted by them. Thus, appellees met their summary judgment burden of proof and established quasi-estoppel as a matter of law.

Additionally, under this record, the trial court did not err in refusing to find that Cambridge was a bona fide purchaser in connection with the new Section 33 leases. A bona fide purchaser of real property is one who buys property in good faith for valuable

10

consideration and without notice (actual or imputed) of outstanding claims in a third party and is an affirmative defense to a title dispute. *Madison v. Gordon,* 39 S.W.3d 604, 606 (Tex. 2001); *Houston Oil Co. v. Hayden,* 104 Tex. 175, 135 S.W. 1149, 1152 (1911). Notice may be constructive or actual. *Flack v. First Nat'l Bank,* 148 Tex. 495, 226 S.W.2d 628, 631 (1950). Actual notice rests upon personal information or knowledge. *Id.* at 631. Constructive notice is notice the law imputes to a person not having personal knowledge. *Id.* at 632*.* One purchasing land may be charged with constructive notice of an occupant's claims. *Madison v. Gordon,* 39 S.W.2d at 606. This implied notice doctrine applies if a court determines that the purchaser has a duty to ascertain the rights of a third party possessor. *Id.; see also Collum v. Sanger Bros.*, 98 Tex. 162, 82 S.W. 459, 460 (1904). When this duty arises, the purchaser is charged with notice of all the occupant's claims that the purchaser might have reasonably discovered on proper inquiry. *Madison v. Gordon,* 39 S.W.2d at 606; *see also Dixon v. Cargill,* 104 S.W.2d 101, 102 (Tex. Civ. App. –Eastland 1937, writ ref'd). The duty arises, however, only if the possession is visible, open, exclusive, and unequivocal. *Madison v. Gordon*, 39 S.W.3d at 606; *Strong v. Strong*, 128 Tex. 470, 98 S.W.2d 346, 350 (1936).

Indeed, in *Strong*, the court described the possession necessary to give constructive notice as consisting "of open, visible, and unequivocal acts of occupancy in their nature referable to exclusive dominion over the property, sufficient upon observation to put an intending purchaser on inquiry as to the rights of such possessor . . . . " *Strong v. Strong*, 98 S.W. 2d at 350. "Possession that meets these requirements – visible, open,

11

exclusive, and unequivocal possession – affords notice of title equivalent to the constructive notice deed registration affords." *Madison v. Gordon*, 39 S.W. 3d at 607.

The case of *Albright v. Hoyt*, 57 S.W.2d 342 (Tex. Civ. App.–Texarkana 1933, writ ref'd), is also instructive in determining whether possession by a land purchaser's tenant was sufficient to give constructive notice to an oil and gas lease purchaser's bona fide purchaser claim. In that case, Hoyt had brought suit against Albright to enforce a contract for the sale of land. After the discovery of oil on the land, although Hoyt had paid the purchase price of the land, Albright refused to surrender title to him and executed an oil and gas lease to James S. Smith. Noting that at the time when Smith obtained the lease from Albright, Hoyt's tenant was in possession of the land, the court held that the possession by the tenant constituted notice to Smith "of all titles claimed by Hoyt to the land." *Id.* at 345. Thus, it affirmed the trial court's verdict in favor of Hoyt.

At the time Cambridge obtained its "top leases," Geodyne, as a working interest owner, was in possession of the Prater Unit, was operating a producing well on the Unit and was paying and had been paying royalties from production on that Unit to Geodyne's lessors. Had Cambridge made reasonable inquiry as to the basis upon which Geodyne was "in possession" of the well and was paying royalties from production to Geodyne's lessors, it would have discovered the basis upon which Geodyne claimed in connection with the Unit Designation and the Section 33 leases.

Additionally, we note the provisions in the new Section 33 leases that in the event "there is a presently existing oil and gas lease, modification thereof or unitization agreement covering the Leased Premises," that the new leases would be subject thereto and would vest upon the termination of such prior leases, insofar as they might be valid

12

as well as the provision that the lessee might take whatever actions that were necessary to obtain releases of such prior leases. Those provisions indicate that Cambridge recognized that it stood in the position of the necessary parties insofar as the existence of the Section 33 leases and could claim no greater rights than its lessors. Those provisions also militate against any bona fide purchaser claim by Cambridge.

In sum, for the reasons we have articulated above, the trial court's summary judgment must be, and is hereby, affirmed.


John T. Boyd
Senior Justice